1  UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States *ex rel.* | ) | Civil Action No._____ |
| | ) | |
| GENE KLUSMEIER | ) | Complaint and Jury Demand |
| 4930 Coconut Boulevard | ) | |
| Palm Beach, Florida   33411 | ) | Date Received_____ |
| | ) | |
| JACQUELINE KLUSMEIER | ) | Original Complaint filed |
| 4930 Coconut Boulevard | ) | under Seal pursuant to 31 |
| Palm Beach, Florida   33411 | ) | U.S.C. '3730(b)(2) |
| | ) | |
| BRINGING THIS ACTION ON BEHALF | ) | |
| OF THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| c/o Roscoe C. Howard, Jr., | ) | |
| United States Attorney | ) | |
| Judiciary Center Building, | ) | |
| 555 Fourth Street, NW, | ) | |
| Washington, 20530 c/o John Greene | ) | _____ |
| | ) | United States District Court |
| and | ) | |
| | ) | |
| c/o John Ashcroft | ) | |
| Attorney General of the United States | ) | |
| U.S. Department of Justice | ) | |
| 10th and Constitution Avenues, N.W. | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| MODERN CONTINENTAL SOUTH, INC. | ) | |
| 278 Garrison Road, | ) | |
|  Pelzer SC 29869 | ) | |
| | ) | |
| BERGERON LAND DEVELOPMENT, INC. | ) | |
| 19612 SW 69th Place | ) | |
| Fort Lauderdale , FL  33332 | ) | |

GRUNDY MARINE                                    )
CONSTRUCTION COMPANY                             )
2209 Park Place  Sawgrass Village                )
Ponta Vedra each, FL 32082                       )
                                                 )
ARTEM, INC                                       )
1897 Bacom Point Road Pahokee,                   )
FL 33476                                         )
                                                 )
HARRY PEPPER & ASSOCIATES, INC.                  )
215 Century 21 Drive,                            )
Jacksonville, FL 32216                           )
_____ )

## COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et al.* of the False Claims Act filed by

Relators Gene Klusmeier and Jacqueline Klusmeier, husband and wife, in the name of the United

States Government to recover penalties and damages arising from Defendant Bell Constructors,

Inc.'s violations of federal contract requirements concerning its construction of a federally

funded project.

## PARTIES

1.      Relator/Plaintiff, Gene Klusmeier of 4930 Coconut Boulevard, Palm Beach,

        Florida is and was at all relevant times, the vice-president of Nu-Way and holds

        15% share in the company.

2.      Relator/Plaintiff, Jacqueline  Klusmeier also of 4930 Coconut Boulevard, Palm

        Beach Florida,  is and was at all relevant times, the President of Nu-Way Lawns

        Inc. (Nu-Way").  She holds 85% share of the company.

3.      Bell Constructors, Inc. of 1340 Lexington Avenue, Rochester, New York ("Bell")

        is the prime contractor of Contract Number DACW17-02-C-0033 for the

construction of a water treatment project in Florida. Bell is the defendant in the related case 1:04CV00904.

4.  Defendant, Modern Continental South, Inc. Of 278 Garrison Road, Pelzer SC 29869 which was awarded contract number DACW17-00-C-0043 for an amount of 18,601,185.

5.  Defendant, Bergeron Land Development, Inc. of 19612 SW 69th Place, Fort Lauderdale , FL  33332 which was awarded contract number W912EP-04-C-0007 for an amount of $2,99,7195.

6.  Defendant, Grundy Marine Construction Company of 2209 Park Place  Sawgrass Village Ponta Vedra each, FL 32082 which was awarded contract DACW17-02-C-0027 for an amount of $5,184,5000.

7.  Defendant, ARTEM, Inc 1897 Bacom Point Road Pahokee, FL 33476 which was awarded contract DACW17-01-C-0020 for an amount of $3,654,343

8.  Defendant, Harry Pepper & Associates, Inc. 215 Century 21 Drive, Jacksonville, FL 32216 which was awarded contract DACW17-01-C-0017 for an amount of $2,170,000.

9.  Hereinafter all parties listed in paragraphs 4-8 shall be referred to collectively as the "Defendants."

## JURISDICTION AND VENUE

10.  The allegations set forth in paragraphs 1-9 are hereby re-alleged and set forth fully as above.

11.  The Relators Gene and Jacqueline Klusmeier, hereby allege causes of action under 31 U.S.C. sections 3729 *et. al*. of the False Claims Act, arising from the

Defendants' misrepresentations to both the South Florida Water Management

District ("SFWMD") and the Army Corps of Engineers, and substandard

construction of the water treatment project that is the subject of Contracts

Numbered DACW17-03-C-0004; DACW17-00-C-0043; W912EP-04-C-0007;

DACW17-02-C-0027; DACW17-01-C-0020; DACW17-01-C-0017.

12.    Jurisdiction over all stated causes of action is conferred upon this Court by 31

U.S.C. Section 3732 and 28 U.S.C. Section 1331 in that this action arises under

the laws of the United States.

13.    This Complaint is filed as a related case to *United States, ex rel Klusmeier v. Bell*

*Cosntructor's Inc.* 1:04 CV 00904  ("*Klusmeier v. Bell*") filed under seal on June

3, 2004 which is currently before Judge Rosemary M. Collyer.

14.    The cases are related pursuant to LCVR 40.5 in that the *Klusmeir v. Bell* Case is

still pending and this case relates to common property, involves common issues of

fact and grows out of the same events. It involves substantially the same overall

construction site as the earlier case with the same federal involvement in funding

and regulating the construction.

15.    The Defendants do business in Washington, DC

16.    Venue and jurisdiction are proper  pursuant to 28 U.S.C. Section 1391(c) and 31

U.S.C. Section 3732 as the Defendants are corporations subject to personal

jurisdiction in Washington, DC.

## INCORPORATION OF PREVIOUS

## DISCLOSURES MADE PURSUANT TO RELATED CASE

17.    The allegations contained in paragraphs 1-16 are hereby re-alleged and set forth fully as above.

18.    The Plaintiffs have provided supbstantial evidence to support their allegations in the Related Case of *Klusmeier v. Bell*.

19.    Much of that evidence is relevant to this case.  Plaintiffs, therefore, incorporate by reference all evidence filed with the Department of Justice and the U.S Attorney's office related to that case.

20.    Prior to filing the complaint, a Disclosure Statement with exhibits was provided to the Department of Justice on June 3, 2004, which included virtually all of the allegations made in the complaint with supporting exhibits.

21.    Mr. Klusmeier also made several earlier disclosures of his allegations to government agencies, which are referenced in the June 3, 2004 Relator's Statement.

22.    The June 3, 2004, Relator's Statement specifies in detail Bell's obligations under its contract with the South Florida Water Management District "SFWMD." That contract is listed as No. DACW17-02-C-0033 or Storm Water Treatment Area 1 East, Contract 6.

23.    The specifications and requirements of that contract were previously submitted as "Exhibit. 3" to the earlier Relator's Statement.

24.    After filing the initial disclosure statement and Complaint, Mr. Klusmeier met with investigator James Scheel and Department of Justice Attorney Arnie Auerhan at the Law offices of Kohn, Kohn and Colapinto, LLP., to discuss the case.

25.     Assistant U.S. Attorney Laurie Weinstein was informed about the meeting, but was unable to attend.

26.     At the meeting,  Mr. Klusmeier discussed Bell's failure to perform its contract. He also presented bags of soil samples he personally took from the Bell site.

27.     The soil samples remain in Mr. Klusmeier's possession.  Mr. Klusmeier also provided the Government with names of other workers who had first hand knowledge of Bell's construction practices at the site.

28.     At the Government's request, Mr. Klusmeier  met with James Scheel and toured the site with Mr. Scheel on December 31, 2004.

29.     Also present was Relator Jacquiline Klusmeier and an Attorney from Kohn, Kohn & Colapinto, LLP. Mr. Klusmeier was able to show Mr. Scheel results of Bell's failure to perform under its contract with the SFWMD during this site tour. Mr. Scheel also took his own photographs of the site on that day.

30.     Mr. Klusmeier was able to show Mr. Scheel additional evidence of poor construction on other areas of the overall site.

31.     Additional, faulty construction on the site is being handled by additional federal contractors.

32.     During the tour of the site Mr. Klusmeier was able to show Mr. Scheel. areas of the construction, where it was obvious additional work had already been performed, because of poor construction throughout the site.

33.     On January 28, 2005, Mr. Klusmeier met with ARMY CID official Janet Keller and with an Attorney from Kohn, Kohn, & Colapinto, LLP available by telephone.

34.   Ms. Keller asked Mr. Klusmeier to describe details with regard to photographs she had taken of the site as well as a set Mr. Klusmeier had taken of the site.

35.   Purusant to the investigation of the Bell contract, Mr. Klusmeier also participated in a conference call with Ms. Keller of the U.S. Army and with an attorney from Kohn, Kohn & Colapinto on July 22, 2005.

36.   Ms. Keller had initially investigated some of Mr. Klusmeier's complaints regarding the site.

37.   On February 17. 2005, Mr. Klusmeier submited a Supplemental Disclosure Statement with additional photographs of the site, which provide additional evidence.

38.   The February 17, 2005 Supplemental Disclosure provides the names and contracts of other contractors who Mr. Klusmeier personally observed as performing substandard work.

39.   Those contractors are named as defendants in this related case filing.

## FACTS

40.   The alleagations in contained in paragraphs 1-39 are hereby re-alleged and fully set forth as above.

41.   As stated in detail in the filings for the related case, the Bell-SFWMD contract is part of a greater federally funded water treatment project site in Florida called Storm Water Treatment Area 1 East.

42.   Each of  the listed defendants also contracted to build build portions or all of levees and other construction as part of this same greater federally funded water treatment project.

43.    This federally funded water treatment project spans an area of roughly 15 square miles, and encompasses approximately 10 "Cells."

44.    These "cells" are physically bounded on all sides by levees, and are designed to hold massive amounts of water for treatment and filtration..

45.    Each cell is approximately one square mile and holds water to a depth of eight feet.

46.    The construction of the levees must be strong enough to control the water, not only to filter and improve its quality, but also to control flooding and thereby prevent any harm to public safety.

47.    The Relators' company, (Nu-Way) specializes in spreading Hydroseed, a combination of water and grass seed.

48.    By combining the water and grass seed into slurry, it is possible to spread the grass seed evenly over a wide area of construction.

49.    Nu-Way was not responsible for topsoil and construction conditions under its sub-contract.

50.    Prior to Nu-Way's spreading Hydroseed, Bell was required to complete all other aspects of construction of the levee.

51.    Prior to spreading hydroseed or applying sod the primary contractors would all be required to complete construction of seeded areas.

52.    Growing grass on the top of the levee structure is intended to strengthen the overall construction of the levee.

53.    Although grass will strengthen a properly built levee, the use of grass seed alone cannot adequately strengthen a poorly built levee or compensate for any structural

deficiencies caused by other substandard construction or the use of other substandard materials.

54.    The contract specifications define the requirements for building the levees including, but not limited to, the degree of compactness of the levees below the topsoil surface, the types of stone to be used below the topsoil surface, the depth of topsoil to be used and the quality of topsoil required prior to hydroseeding the site.

55.    The contracts which are the subject of this complaint include similar if not identical requirements of the Bell-SFWMD contract as all the specifications were created pursuant to the administration of the U.S. Army Corps of Engineers to regulate construction on the same overall site.

56.    Plaintiff, Gene Klusmeier on behalf of Nu-Way worked on the site from March 31st of 2003 to January 22nd of 2004.

57.    While working on the site, Mr. Klusmeier personally observed numerous violations of the contract specifications that would threaten the structural integrity of the dykes many of which are detailed below.

58.    After working on the site, Mr. Klusmeier has actively monitored construction activity there as well.

## FALSE CLAIMS ACT VIOLATIONS

**THE DEFENDANTS' KNOWING, RECKLESS AND WILLFUL VIOLATIONS OF ITS CONTRACTUAL OBLIGATIONS INCLUDE, BUT ARE NOT LIMITED TO,VIOLATIONS OF CONSTRUCTION REQUIRMENTS AS FOLLOWS:**

## COUNT I

59.  The allegations in paragraphs 1-58 are re-alleged fully as set forth above.

60.  Section 02921, Subsection 1.3.2 of the Bell-SFWMD contract governs inspection of topsoil and states, in part, that the following must be rejected for use as topsoil on the Bell levees, "topsoil that contains slag, cinders, stones, lumps of soil, sticks, roots, trash or other material over a minimum 1-1/2 inch diameter; and topsoil that contains viable plants and plant parts."

61.  Section 02921, Subsection 2.2 echoes these quality requirements for topsoil by requiring that the topsoil used for the Bell levees, "be free from slag, cinders, stones, lumps of soil, sticks, roots, trash or other material over a minimum 1-1/2 inch diameter. Topsoil shall be free from viable plants and plant parts."

62.  The contract specifications binding on all defendants are similar to if not identical to that of the Bell-SFWMD contract as all contract specifications were prepared according to the direction of the United States Army Corps of Engineers to regulate construction on the same federally funded project site.

63.  In addition, any topsoil which would violate the above provisions, would not be suitable to grow grass, to strengthen the dyke, nor would it serve the purpose of constructing a proper dyke, which could be made strong enough to withstand the its expected use.

64.  On the embankments in which Defendants actually used topsoil rather than sand, they failed to remove sticks, roots, trash, and stones from the topsoil as required.

65.  Plaintiff, Gene Klusmeier personally witnessed the presence of stones, roots, trash, sticks and other materials over 1.5 inches diameter in the topsoil used throughout levees on the site.

66.     Therefore, the Defendants' knowingly and willfully acted with reckless disregard for the applicable construction requirements tracts regarding their duty to inspect topsoil and remove inappropriate materials from the topsoil.

67.     They failed to use topsoil which would be of sufficient quality to perform the basic construction needed on the site.

68.     The United States Government has been damaged to the extent of any payments made under the contract to the Defendants, as a result of thes knowing, willful, and reckless disregard for the construction requirements as to the topsoil the Defendantsl used.

69.     The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the contract.

70.     As a result of the Defendant's failure to comply with the requirements to inspect topsoil and to remove inappropriate material from their topsoil they put the structural integrity of all of its construction at risk.

71.     Each Defendant also put at risk the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed in such a faulty manner could lead to flooding which would effect the entire project area.

72.     By creating a risk that a dyke could fail, the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## <u>COUNT II</u>

73.     The allegations in paragraphs 1-72 are re-alleged fully as set forth above.

74.   Section 02300, Subsection 3.9 of the Bell-SFWMD contract, regarding the placement of the topsoil used on all the Bell levees requires that, "on areas to receive topsoil, the compacted subgrade soil shall be scarified to a 4 inch depth for bonding of topsoil with subsoil.

75.   Section 02300, Subsection 3.9 of the Bell-SFWMD contract also requires Topsoil then shall be spread evenly to a thickness of 4 inches and graded to the elevations and slopes shown."

76.   The contract specifications binding on all defendants are similar to, if not identical to, that of the Bell-SFWMD contract, because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers to regulate construction on the same federally funded project site.

77.   In addition, any use of topsoil, which would violate the above provisions would not be suitable to the purpose of constructing a proper dyke.

78.   It would not support the proper growth of grass, nor would it create a levee strong enough to withstand the use expected for the project.

79.   The Defendants failed to spread topsoil evenly to a thickness of 4 inches even in the few places, where they used material approaching the required quality for topsoil, as defined under the contract. (See Below)

80.   The Defendants failed to scarify, to a 4 inch depth, the compacted subgrade soil lying underneath the topsoil used on levees encountered by the Relator Mr. Klusmeier.

81.     Therefore, the Defendants knowingly and willfully acted with reckless disregard for the construction requirements regarding scarifying the layer below the topsoil surface, and spreading an appropriate amount of topsoil.

82.     The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants as a result of their knowing, willful, and reckless disregard for the construction  requirements as to the preparation of the site and the amount of topsoil used.

83.     The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the contract or to make them usefull for the purposes they were initially constructed.

84.     The Defendants put at risk the structural integrity of the dykes through their failure to scarify the layer below the topsoil and their failure to comply use the proper amount of topsoil.

85.     Each Defendant also put at risk the the other related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed by any individual Defendant could lead to flooding which would affect the entire project area.

86.     By creating a  risk that a dyke could fail, the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT III

87.     The allegations in paragraphs 1-86 are re-alleged fully, as set forth above.

88.     Section 02921, Subsection 3.2.3 of the Bell-SFWMD contract which governs the

tilling of the topsoil requires that:

> Soil on slopes up to a maximum 3-horizontal-to-1-vertical shall be tilled
> to a minimum 4 inch depth.  On slopes between 3-horizontal-to-1-vertical
> and 1-horizontal-to-1-vertical, the soil shall be tilled to a minimum 2 inch
> depth by scarifying with heavy rakes, or other method. Rototillers shall be
> used where soil conditions and length of slope permit.  On slopes 1-
> horizontal-to-1-vertical and steeper, no tillage is required.  Drainage
> patterns shall be maintained only where and as indicated on drawings.
> Areas compacted by construction operations shall be completely
> pulverized by tillage.  Soil used for repair of surface erosion or grade
> deficiencies shall conform to topsoil requirements.  The fertilizer and soil
> conditioner may be applied during this procedure.

89.     The contract specifications binding on all defendants were similar to, if not

identical to, that of the Bell-SFWMD contract as all contract specifications were

prepared according to the direction of the United States Army Corps of Engineers

to regulate construction on the same federally funded project site.

90.     In addition, construction and use of  topsoil in a manner which would violate the

above provision, would not be suitable to the purpse of constructing a proper

dyke, it would not support the growth of grass and would not be strong enough to

withstand the use expected in the project.

91.     The Defendants failed to till the soil on the slopes of their levees.

92.     The Defendants also failed to completely pulverize by tillage those areas on the

construction site that had been compacted.

93.     Furthermore, the construction vehicles used by the Defendants in the course of its

operations created new drainage patterns which violated additional provisions in

the Bell-SFWMD contract (Section 02921 Subsection 3.2.3. as well as Section

02921, Subsection 3.2.1, Section 02300 Sub-Section 3.8 and Section 02921 Sub Section 3.2.4.3) as discussed below.

94.    The Defendants ran *Caterpillar* machines over the surface cutting grooves into the embankments.

95.    The grooves in the surface lead down embankments creating a new drainage pattern for the site.

96.    Additionally, the Defendants used sand to attempt to repair surface erosion and grade deficiencies in its levees.

97.    Therefore, the Defendants also failed to use the proper soil for repair of surface erosion as required.

98.    The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the knowing, willful, and reckless disregard for the government construction requirements as to the preparation of the topsoil layer of the site.

99.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the construction requirements.

100.    As a result of the Defemdants' failure to comply with the construction requirements for preparing the site, the structural integrity of the dykes have been put at risk.

101.    Each individual defendant also put at risk the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in a dyke could lead to flooding which would affect the entire project area.

102.    By creating a risk that a dyke could fail, the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT IV

103.    The allegations set forth in paragraphs 1-102 are re-alleged fully as set forth above.

104.    Section 02921, Subsection 3.2.1 of the Bell-SFWMD contract discusses verification of the site under the contract.

105.    Subsection 3.2.1 provides that, "the Contractor shall verify that finished grades are as indicated on drawings, and the placing of topsoil, smooth grading, and compaction requirements have been completed in accordance with Section 02300 EARTHWORK, prior to the commencement of the seeding operation."

106.    The contract specifications binding on all defendants, are similar to, if not identical to, that of the Bell-SFWMD contract as all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and to regulate construction on the same federally funded project site.

107.    In addition, any failure to verify that the finished grades, topsoil,smooth grading and compaction were proper, which would violate the above provisions, would not be suitable to the purpose of constructing a proper dyke which would be strong enough to withstand the use expected in the project.

108.    On information and belief, the Defendants either failed to verify that the soil placement, smooth grading, and compaction requirements had been met, or would have had to falsify such verification.

109.  The Defendants' failure to verify that they met the contract provisions with regard to topsoil placement, smooth grading and compactness or in the alternative, their fraudulent verification of these contract requirements led to the use of hydroseed and sod when the site was not prepared.

110.  The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of their knowing, willful, and reckless disregard for the government contract requirements as to the verification of the requirements for the site.

111.  The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the construction requiements.

112.  As a result of the Defendants' failure to comply with the construction requirements for preparing the site, the structural integrity of the dykes has been placed at risk.

113.  Each Defendant also jeopardized the rest of the overall related federally funded construction in Storm Water Treatment Area 1 East, because any fault in a dykes could lead to flooding which would affect the entire project area.

114.  By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## **COUNT V**

115.  The allegations set forth in paragraphs 1-114 are re-alleged fully, as set forth above.

116.  Ssection 02921 Sub-Section 2.2 TOPSOIL of the Bell-SFWMD contract states:

Topsoil shall be as defined in ASTM D 5268.The topsoil shall be the most suitable existing surface soil stripped and stockpiled onsite in accordance with Section 02300 EARTHWORK.  Topsoil shall be free from slag, cinders, stones, lumps of soil, sticks, roots, trash or other material over a minimum 1-1/2 inch diameter.  Topsoil shall be free from viable plants and plant parts.

117.  The ASTM (American Society for Testing and Materials) specification    D 5268

initially describes topsoil under section 3.2.1:

118.  ASTM designation D 5268 further defines topsoil under its section 4.2:

119.  Table 1" is as follows:

| TABLE 1 Specification for Topsoil | |
| --- | --- |
| Compositional Category | Percentage By Mass |
| Total SampleDeiterious materials (rock, gravel, slag, cinder roots, sod) | 5 max |
| Material passing the No. 4 (4.75mm) sieve | |
| Organic Material | 2 to 20 |
| Sand content | 20 to 60 |
| Silt and clay content | 35 to 70 |
| pH | 5 to 7 |

120.  The contract specifications binding on all defendants are similar to, if not

identical to, that of the Bell-SFWMD contract as all contract specifications were

prepared according to the direction of the United States Army Corps of Engineers

to regulate construction on the same federally funded project site

121.  In addition, construction and use of substandard topsoil, which would violate the

above provision, would prevent the construction of a proper dyke, which could

support grass growth and be strong enough to withstand the use expected in the

project.

122.    The topsoil used throughout the construction site by the Defendants' did not support the growth of grass.

123.    Close inspection of the material used as topsoil revealed that it was mostly sand.

124.    Topsoil analysis performed on the Bell Site showed that the sand content of the material Bell was using for topsoil was much higher than that allowed under Bell's contract with SFWMD and the ASTM specifications.

125.    The highest sand content contemplated by ASTM for topsoil is 60%, while the least sand content in any sample in these tests was 92%

126.    The tests also show that the silt and clay content was much lower than described in the ASTM specification.

127.    Silt and clay content can be as low as 35% and as high as 70% and still be acceptable in topsoil according to Table 1 of ASTM specification D 5268

128.    None of the samples tested for Bell fall within these ranges.

129.    On inspection of the site, the sand used on levees constructed by the Defendants was similar to that used by Bell.

130.    The fact that grass did not grow on most of the site was an indication of the poor quality topsoil.

131.    Topsoil which is mostly sand is not a suitable material because it cannot be compacted, erodes quickly when exposed to the elements, and does not generally possess a sufficient level of organic content to permit the growth of grass.

132.    While some sandy topsoil is capable of growing some grass, the Bell-SFWMD contract specifications require the use of a better quality of Topsoil in order to create a stronger levee.

133.    The sand used by the Defendants could not possibly be described as consisting, "…of the most suitable materials for that purpose" as required under Section 02300 Sub-Section 1.4.5.

134.    Given this information, the Defendants either knew or reasonably should have known that the sandy topsoil on their levees did not construction requirements, and that this sandy topsoil would not be suitable for growing grass seed.

135.    The United States Government has been damaged to the extent of any payments made under the contract to the Defendants, as a result of their knowing, willful, and reckless disregard for the construction requirements as to the use of topsoil.

136.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the construction requirements.

137.    The Defendants' failure to comply with the construction requirements for using proper topsoil, jeopardizes the structural integrity of the dykes.

138.    Each Defendant's failure to comply with the contract requirement for using proper topsoil also jeopardizes the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed could lead to flooding which would affect the entire project area.

139.    By creating a  risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## <u>COUNT VI</u>

140.    The allegations contained in  paragraphs 1-139 are hereby re-alleged fully, as set forth above.

141.    Section 02921 Sub-section 3.2.4.1 of the Bell-SFWMD contract requires, in part that "The prepared surface shall be completed with a light raking to remove debris."

142.    The contract specifications binding on all Defendants were similar to, if not identical to, that of the Bell-SFWMD contract, because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers in order to regulate construction on the same federally funded project site.

143.    A failure to prepare the surface layer properly, which would violate the above provision, would also inibit the growth of grass and would not protect against damage and erosion.

144.    Debris inhibits proper growth of grass seed. Debris also inhibits the ability to care for the surface even after hydroseed or sod is applied

145.    The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of their knowing, willful, and reckless disregard for the requirements to prepare the surface properly including the Defendantss' failure to remove debris.

146.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the contract.

147.    The Defendants' failure to prepare the surface properly to promote the growth of grass jeopardizes the structural integrity of the dykes

148.   Each Defendant's failure to comply with this requirement for preparing the site also jeopardizes the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed could lead to flooding which would affect the entire project area.

149.   By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT VII

150.   The allegations contained in  paragraphs1-149 are hereby re-alleged fully as set forth above.

151.   Section 02300 Sub-Section 3.8 of the Bell SFWMD contract specifies how the surface is to be finished as follows:

> The Surface of excavations, embankments, and fills shall be finished to a smooth and compact surface in accordance with the lines, grades and cross sections or elevations shown and the requirements of paragraph TOLERANCES. Gutters and ditches shall be finished in a manner that will result in effective drainage. The Surface of areas to be turfed shall befinished to a smoothness suitable for the application of turfing materials.

152.   The contract specifications binding on all Defendants were similar to, if not identical to, that of the Bell-SFWMD contract because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers to regulate construction on the same federally funded project site.

153.   In addition, a failure to finish the surface layer properly, which would violate the above provision, would also inibit the growth of grass and would not protect against damage and erosion.

154.    Such a construction failure would render a dyke unable to fulfill its purpose as it would not be strong enough to withstand the use expected in the project.

155.    Defendants ran a *Caterpillar* machine over the surface of the Levees apparently in an attempt to "compact" or "finish" them. (See below for Defendants' failure to properly compact the site)

156.    The direction of the grooves indicates that the *Caterpillar* machine created drainage problems for the levees.

157.    Grooves were cut into the surface heading down the embankment which would allow water to drain off the surface instead of along the length of the levees.

158.    The Defendants' *Caterpillar* machines drove along the surface of the embankments rather than up and down, which would have taken longer, but not created as significant a drainage problem.

159.    Therefore, the Defendants created a drainage problem and did not smooth the surface.

160.    Such a drainage problem and unsmooth surface would inhibit the growth of grass and contribute to erosion.

161.    The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the Defendants' knowing, willful, and reckless disregard for construction requirements including their failure to properly smooth the surface and not create new drainage patterns.

162.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the construction requirements.

163.    The Defendants' failure to smooth the surface properly and their creation of new drainage patterns jeopardizes the structural integrity of dykes.

164.    Each Defendant's failure to comply with this construction requirement for preparing the site, also jeopardizes the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes could lead to flooding which would affect the entire project area.

165.    By creating a risk that a dyke could fail, the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT VIII

166.    The allegations contained in paragraphs 1-165 are hereby, re-alleged fully, as set forth above.

167.    Section 02921 Sub Section 3.2.4.3 of the Bell-SFWMD contract requires that "areas with the prepared surface shall be protected from compaction or damage by vehicular or pedestrian traffic and surface erosion."

168.    The contract specifications binding on all Defendants were similar to, if not identical to, that of the Bell-SFWMD contract because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded project site.

169.    In addition, a failure to protect the prepared surface layer properly, which would violate the above provision, would also inibit the growth of grass and would not protect against damage and erosion.

170.  Such a construction failure would render a dyke unsuitable to its purpose, and prevent it from being strong enough to withstand the use expected in the project.

171.  The Defendants drove construction vehicles over what was supposed to be prepared surfaces and created additional damage instead of protecting the levees.

172.  To the extent that the Defendants repaired such damage they failed to properly compact the resulting area.

173.  The Defendants did make some inadequate attempts to control traffic

174.  However,vehicles continued to drive over the rest of the levees.

175.  The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the knowing, willful, and reckless disregard of the requirements to protect the site.

176.  The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the construction requirements.

177.  The Defendants' failure to protect the prepared surface of the site jeopardized the structural integrity of the dykes built, by inhibiting the proper growth of grass and contributing to erosion.

178.  Each Defendant's failure to comply with this requirement for prortecting the site also jeopardizes the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed could lead to flooding which would affect the entire project area.

179.  By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT IX

180.   The allegations set forth in paragraphs 1-179 are re-alleged fully, as set forth

above.

181.   Section 02921 Sub-Section 3.3.4 of the Bell-SFWMD contract requires that grass

seed be watered "immediately after completing the seeding of an area."

182.   The contract specifications binding on all Defendants were similar to, if not

identical to, that of the Bell-SFWMD contract because all contract specifications

were prepared according to the direction of the United States Army Corps of

Engineers and were designed to regulate construction on the same federally

Funded project site.

183.   In addition, a failure to water the grass, which would violate the above provision,

would also prevent the growth of grass and would therefore prevent planted grass

seed or sod from protecting against damage and erosion.

184.   Such a construction failure jeopardizes the structural integrity of the dyke and

could render a dyke to be unsuitable to its purpose, as it would not be strong

enough to withstand the use expected in the project.

185.   Indeed, the University of Florida Institute of Food and Agricultural Sciences says

that "proper watering is the most critical step in establishing turf grasses from

seed.

186.   The soil must be kept continuously moist but not excessively wet until seeds have

germinated." *University of Florida Fact Sheet, Establishing Your Florida Lawn*,

2001.

187.    As a result of the Defendants' failure to water the grass seed, grass did not grow properly throughout the entire project site and therefore could not protect against erosion and  strengthen the embankments.

188.    The United States Government has been damaged to the extent of any payments made under the contract to the Defendants, as a result of the knowing, willful, and reckless disregard for the requirements that they water the site.

189.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the construction requirements.

190.    The Defendants' failure to water the site jeopardized the structural integrity of the dykes built.

191.    Each Defendant's failure to comply with this requirement also jeopardizes the rest of the related federally funded construction in Storm Water Treatment Area 1 East, because any fault in dykes constructed by the Defendantsl could lead to flooding which would affect the entire project area.

192.    By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## **COUNT X**

193.    The allegations contained in in paragraphs 1-192 are hereby re-alleged fully, as set forth above.

194.    Section 02921 Sub-Section 3.7.3 requires

> …eradicating weeds, insects and diseases; protecting embankments and ditches from surface erosion; maintaining erosion control materials and

mulch; Protecting installed areas from traffic; mowing; watering; and post fertilization.

195.   The contract specifications binding on all Defendants were similar to, if not identical to, that of the Bell-SFWMD contract because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded project site.

196.   In addition, a failure to water the grass, which would violate the above provision, would also prevent the growth of grass and would not protect against damage and erosion.

197.   Such a construction failure would render a dyke to be unsuitable to its purpose, and fail to make it strong enough to withstand the use expected in the project.

198.   The Defendants did not eradicate weeds from the site.

199.   The Defendants did not maintain erosion controlwith proper materials.

200.   As noted above, The Defendants did not water the site in a timely fashion.

201.   As noted above, The Defendants did not protect areas from traffic.

202.   The Defendants provided no visible post fertilization for areas seeded or where sod was installed.

203.   As a result of the Defendnts' violation of these requirements, grass has not grown properly and the site was not protected from erosion and other harm.

204.   The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the knowing, willful, and reckless disregard for the requirements to care for the site.

205. The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the construction requirements.

206. The Defendants failure to prootect the seeded sites jeopardized the structural integrity of the dykes constructed.

207. Each of The Defendant's have also endangered rest of the additional, related federally funded construction at Storm Water Treatment Area 1 East, because any fault in dykes constructed could lead to flooding, which would affect the entire project area.

208. By creating a risk that a dyke could fail, the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

<u>**COUNT XI**</u>

209. The allegations contained in paragraphs 1-208 are hereby re-alleged fully, as set forth above.

210. During the 10 month period that Mr. Klusmeier was working on the site he constantly came into contact with the construction of the levees below the topsoil layer.

211. The compactness of the embankments is specified under Section 02300 Sub-Section 3.7 which states:

> Earth embankments from levees shall be constructed from satisfactory materials free of organic materials and rocks with any dimension greater than 3 inches. The material shall be placed in successive horizontal layers of loose material not morethan 12 inches in depth. Rocks shall be evenly distributed throughout the layer, exercising care to minimize direct rock-to-rock contact. *Each layer* [emphasis supplied] shall be spread uniformly on a soil surface that has been moistened or aerated as necessary, and

scarified or otherwise broken up so that the fill will bond with the surface on which it is placed. After spreading, each layer shall be plowed, disked, or otherwise broken up; moistened or aerated as necessary; thoroughly mixed; and compacted to at least 95 percent of maximum density except for the top 12 inches which shall be compacted to at least 98 percent of maximum density. Compaction shall be accomplished by shepsfoot rollers, pneumatic-tired rollers steel-wheeled rollers, vibratory compactors, or other approved equipment.

212.    The contract specifications binding on all Defendants were similar to, if not identical to, that of the Bell-SFWMD contract because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded site.

213.    In addition, a failure to construct the levees below the topsoil layer properly, which would violate the above provision, would also render a dyke to be unsuitable to its purpose, and fail to make it strong enough to withstand the use expected in the project.

214.    Relator, Mr. Klusmeier maintains that what little compaction activity The Defendants' may have undertook was inadequate to the task.

215.    Mr. Klusmeier also found rocks larger than 3 inches in diameter throughout the construction site in violation of this and other provisions as discussed throughout this complaint.

216.    The Defendants failed to plow, disk or otherwise break up each layer below the surface of the dykes.

217.    Mr. Klusmeier observed no efforts to moisten or aerate any layer of the site, including pre-watering required for proper grass to grow in December.

218.    There was no use of shepsfoot rollers, pneumatic-tired rollers, vibratory
        compactors, or other approved equipment to accomplish compaction on the
        individual layers before the first four layers of construction.

219.    The Defendants did not  compact each layer as required but rather compacted
        several layers at once if at all.

220.    Proper compaction of the layers below the surface is required to strengthen the
        structure and prevent erosion.

221.    The United States Government has been damaged to the extent of any payments
        made under the contracts to the Defendants, as a result of the knowing, willful,
        and reckless disregard for the construction requirements including the failure to
        compact the layers of the construction below the topsoil properly.

222.    The United States Government has been damaged to the extent of any payments
        for additional work required or ordered done to bring the site into compliance
        with the construction requirements.

223.    The Defendants' failure to compact the layers below the topsoil layer properly
        also places the structural integrity of the dykes it constructed at risk.

224.    Each of the Defendant's failure to compact the site properly also jeopardizes
        integrity of the rest of the related federally funded construction contracts at Storm
        Water Treatment Area 1 East  that are part of the Federal Government's water
        treatment project in the Everglades, because flooding from the dykes Bell
        constructed would effect the entire area.

225.    By creating a risk that a dyke could fail, the Defendants also created a public
        hazard to the adjacent town of Wellington and its residents.

## COUNT XII

226. The allegations contained in paragraphs 1-225 are hereby re-alleged fully, as set forth above.

227. The Defendants should have been aware of the fact that their dykes were not constructed to the compactness required, because of testing provisions required.

228. Section 02300 Sub-Section 3.10 of the Bell-SFWMD contract states that tests are to be conducted on each layer of the construction and "…When test results indicate, as determined by the Contracting Officer, that compaction is not as specified, the material shall be removed, replaced and recompacted to meet specification requirements."

229. Section 02300 Sub-Section 3.10.1 of the Bell-SFWMD contract requires extensive in place density testing as follows:

> One test per 10,000 square feet, or fraction thereof, of each lift of embankment or backfill areas compacted by other than hand-operated-machines.One test per 500 square feet, or fraction thereof, of each lift of embankment or backfill areas compacted by hand operated machines.

230. The contract specifications binding on all Defendants are similar to, if not identical to, that of the Bell-SFWMD contract, because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded project site.

231. In addition, a failure to construct the levees below the topsoil layer properly, which would violate the above provision, would also render a dyke to be unsuitable to its purpose, and fail to make it strong enough to withstand the use expected in the project.

232.     The construction site covered many, many acres in each Defendant's case it is likely to be at least 50 acres, Bell's contract covered 153 acres.

233.     There are 43,560 square feet in an acre.

234.     Even the less onerous requirement of one test per 10,000 feet requires some 666 in place density tests conducted on *each* 12 inch layer of construction.

235.     The above provision would have required as many as 18 sets of tests for levees built as high as 18 feet.

236.     The Relator was not in a position to continually monitor whether such extensive testing activity may or may not have been conducted by the Defendants in part or in full.

237.     However, Mr. Klusmeier was able to observe the finished sites upon which such testing and required recompacting should have been conducted.

238.     At no time did he note such extensive recompaction as contemplated by these specifications.

239.     Mr. Klusmeier was also able to take photographs, which depict a site with far less than the 98 per cent density required by the contract specifications.

240.     Proper compaction of the layers below the surface is required to strengthen the structure and prevent erosion.

241.     The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the knowing, willful, and reckless disregard for the construction requirements including their failure to properly compact the layers of the construction below the topsoil, even after they

should have tested and found the below surface area to be not sufficiently compacted.

242.  The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the construction requirements.

243.  The Defendants' failure under to test and recompact the levees also places the structural integrity of the dykes constructed at risk.

244.  Each of the Defendant's failure to test and recompact the dykes constructed also endangers the structural integrity of the rest of the related, federally funded construction projects at Storm Water Treatment Area 1 East that are part of the Federal Government's water treatment project in the Everglades, because any flooding from the dykes built by any individual contractor would effect the entire area.1.

245.  By creating a risk that a dyke could fail the Defendants' also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT XIII

246.  The allegations set forth in paragraphs 1-245 are hereby re-alleged fully, as set forth above.

247.  Section 02300 Sub-Section 3.5 of the Bell-SFWMD contract governs the compaction requirements for backfill adjacent to structures on the site.

248.  This contract provision states that such backfill "shall be placed and compacted to at least 90 percent laboratory maximum density for cohesive materials or 95

percent laboratory maximum density for cohesionless materials to prevent

wedging action or eccentric loading upon or against the structure."

249.    The contract specifications binding on all Defendants are similar to, if not

identical to, that of the Bell-SFWMD contract, because all contract specifications

were prepared according to the direction of the United States Army Corps of

Engineers and were designed to regulate construction on the same federally

funded project site.

250.    In addition, the use of prohibited material in backfill areas, which would violate

the above provision, would also threaten the structural integrity of the

construction and possibly render a dyke to be unsuitable to its purpose, and fail to

make it strong enough to withstand the use expected in the project.

251.    The Relator, Mr. Klusmeier, personally observed the use of rocks significantly

larger than three inches in diameter adjacent to structures along the inner levees

that had structures where backfill was used.

252.    Mr. Klusmeier found such prohibited material, including large stones, used in the

backfill near the structures throughout the site

253.    The structures are designed as conduits for water between the cells and the

compaction requirements for earth around them must be met in order to prevent a

weak point in the design.

254.    The United States Government has been damaged to the extent of any payments

made under the contracts to the Defendants, as a result of the knowing, willful,

and reckless disregard for the government contract requirements including Bell's

failure to properly compact the backfill.

255.   The United States Government has been damaged to the extent of any payments for additional work required or ordered to bring the site into compliance with the construction requirements.

256.   The Defendants' failure to use proper backfill materialn also places the structural integrity of the site constructed at risk.

257.   Each of the Defendant's have also endangered the overall federally funded construction at Storm Water Treatment Area 1 East that are part of the Federal Government's water treatment project in the Everglades, because any flooding from the dykes built would effect the entire area

258.   By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT XIV

259.   The allegations contained in paragraphs 1-258 are re-alleged fully, as set forth above.

260.   Section 02370 Sub-Section 2.2.2 of the Bell SFWMD contract governs the use of bedding stones as follows:

Bedding Stone shall be graded with the following limits.

| Sieve Size | Percent Passing by Weight |
|---|---|
| 3 inch | 100 |
| 1-1/2 inch | 65 to 95 |
| ¾ inch | 50 to 80 |
| No. 4 | 30 to 55 |
| No. 20 | 15 to 30 |
| No. 200 | 0 to 5 |

261. The contract specifications binding on all Defendants are similar to, if not identical to, that of the Bell-SFWMD contract, because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded project site.

262. In addition, the use of prohibited material for bedding, which would violate the above provision, would also threaten the structural integrity of the construction and possibly render a dyke to be unsuitable to its purpose, by failing to make it strong enough to withstand the use expected in the project.

263. Based upon this provision and the provision quoted in the previous section, there should be no stones on the site larger than three inches in diameter used in the Backfill or in the Bedding of the levees.

264. Of course, such stones should not be prevalent in the topsoil layer either.

265. However, The Relator, Mr. Klusmeier personally observed stones larger than that size throughout the construction site.

266. The use of larger stones in the bedding and backfill inhibits compaction and weakens the structure of levees.

267. The United States Government has been damaged to the extent of any payments made under the contracts to the Defedants, as a result of the knowing, willful, and reckless disregard for the requirements including the failure to use proper material in the bedding.

268.  The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the construction requirements.

269.  The Defendants' failure to use proper material also places the structural integrity of the dykes constructed at risk.

270.  In placing the dykes built at risk by using improper materials, each of the Defendants has also endangered the entirl, related federal funded construction at Storm Water Treatment Area 1 East.

271.  By creating a risk that a dyke could fail the Defendants also created a public hazard to the adjacent town of Wellington and its residents.

## COUNT XV

272.  The allegations contained in  paragraphs 1-271 are hereby re-alleged fully as set forth above.

273.  Section 02300 Sub-Section 3.6 of the Bell-SFWMD contract specifies the conditions required to prepare the ground surface of the embankments and requires that surface "shall be… scarified and moistened or aerated as required just prior to placement of embankment materials to assure adequate bond between embankment material and the prepared surface."

274.  The contract specifications, binding on all Defendants are similar to, if not identical to, that of the Bell contract, because all contract specifications were prepared according to the direction of the United States Army Corps of Engineers and were designed to regulate construction on the same federally funded project site.

275.    In addition, failure to scarify, moisten or aerate the surfaces to assure adequate bonding between embankment material and the prepared surface, which would violate the above provision, would also threaten the structural integrity of the construction, could render a dyke to be unsuitable to its purpose, and prevent it from being trong enough to withstand the use expected in the project.

276.    The Relator never observed any attempt at scarifying the site on this layer of construction during the time he was working on the site.

277.    The failure to properly prepare the base level of the embankments inhibits compaction and weakens the structure of levees constructed.

278.    The United States Government has been damaged to the extent of any payments made under the contracts to the Defendants, as a result of the knowing, willful, and reckless disregard for the requirements for proper construction.

279.    The United States Government has been damaged to the extent of any payments for additional work required or ordered done to bring the site into compliance with the terms of the contracts beyond the amount specified in the contracts.

280.    The Defendanats' failure to prepare this layer of construction properly also places the structural integrity of the dykes it constructed at risk.

281.    In risking the structural integrity of the dykes, each of the Defendants also endangered other additional related federally funded construction at Storm Water Treatment Area 1 East that are part of the Federal Government's water treatment project in the Everglades.

282.    By creating a risk that a dyke could fail, the Defenants also created a public hazard to the adjacent town of Wellington and its residents.

## **PRAYER FOR RELIEF**

Wherefore, Jacqueline and Gene Klusmeier and Nu-Way Lawns Inc. on behalf themselves and the United States Government prays:

a)    That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendant's misrepresentation's and poor construction methods and any other false violations the defendant made pursuant to work contracted for by the defendant under

b)    That this court enter a judgment against the Defendants in an amount equal to three times the amount awarded to Bell under the contract for constructing levees as to our knowledge, even at this time, the levees are not up to the specifications agreed to by Bell under the contract, plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729, and the costs of this action, with interest, including the cost to the United States Government for its expenses related to this action.

c)    That the Relators be awarded punitive damages in an amount to be determined by jury which shall dissuade the defendant and others from similar action;

d)    That the Relator be awarded all costs incurred including reasonable attorney's fees;

e)    That in the event the United States Government continues to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or the settlement of the claim;

f)    That in the event that the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or settlement;

g)    That the Relator be awarded pre-judgment interest;

h)    That a trial by jury be held on all issues;

j)    That the United States Government and the Relators be granted all relief both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

_____

David Colapinto
DC Bar # 41513
Kohn, Kohn & Colapinto, LLP
3233 P. Street N.W.
Washington D.C. 20007
(202)-342-6980
(202)-342-6984 (fax)
Attorneys for Gene H. Klusmeier and
Jacqueline Klusmeier

Augusts 1, 2005